AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

**FILED**

OCT 1 3 2023

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

for the

Northern District of Oklahoma

| In the Matter of the Search of | ) | |
|---|---|---|
| *A blue Apple iPhone IMEI unknown and a blue Samsung* | ) | Case No. 23-MJ-552-CDL |
| *Android phone IMEI 351488900197197 currently stored* | ) | |
| *at 4944 S. 83rd E. Avenue, Tulsa, Oklahoma 74145* | ) | **FILED UNDER SEAL** |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

> See Attachment "A"

located in the Northern District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized):*

> See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii)** | **Distribution of Methamphetamine** |
| **21 U.S.C. §§ 841(a) and 841(b)(1)(B)(vi)** | **Distribution of Fentanyl** |

The application is based on these facts:

> **See Affidavit of William Mackenzie, attached hereto.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

**William Mackenzie, DEA TFO**
*Printed name and title*

Subscribed and sworn to by phone.

Date: October 13, 2023

*Judge's signature*

City and state:  Tulsa, Oklahoma

Christine D. Little, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

In the Matter of the Search of
A blue Apple iPhone IMEI unknown
and a blue Samsung Android phone
IMEI 351488900197197 Currently
Stored at 4944 S. 83rd E. Avenue,
Tulsa, Oklahoma 74145

Case No. _____

FILED UNDER SEAL

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, William R. Mackenzie, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – two electronic devices (further described in Attachment A) – which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I am deputized as a Task Force Officer with the Drug Enforcement Administration (DEA) presently assigned to the Tulsa, Oklahoma office.  I am also a Tulsa Police Department (TPD)

narcotics detective and have been employed as a TPD officer for over twenty-two years. I have a bachelor's degree in criminal justice from East Central University. As a TPD narcotics detective, I participate in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records. Through my training, education and experience, I am familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs. I have experience as the primary investigator in more than five complex conspiracy cases prosecuted in the federal justice system.

I have trained other narcotic detectives within the Tulsa Police Department's Special Investigations Division. I completed the following coursework and trainings:

a. Oklahoma State Bureau of Investigations Clandestine Laboratory Basic Safety Certification and Clandestine Laboratory Site Safety Officer courses presented by Network Environmental Systems;

b. Drug Enforcement Administration Basic Narcotics Investigator School;

c. Advanced Undercover Narcotics School;

d. Southwest Border Intelligence School and Outlaw Motorcycle Gang school presented by the Association of Oklahoma Narcotic Enforcers;

e. Complex Conspiracies school presented by the Midwest Counterdrug Training Center; and

2

     f.  Communication Exploitation Training presented by the Drug

        Enforcement Administration Special Operations Division.

I also have received formal training in narcotics investigations from the Tulsa Police Academy, and informal training from more experienced officers.

I have participated in over 500 drug related criminal investigations. I have authored federal Title III affidavits and both state and federal search warrants. I have participated in several Title III investigations, purchased narcotics in an undercover capacity on numerous occasions, and executed controlled deliveries of narcotics. I have interviewed hundreds of defendants involved in the use, manufacture, transportation, and illegal sale of controlled dangerous substances. During these interviews, I inquired and learned how individuals involved in drug distribution schemes and networks use and disperse illegal proceeds generated from the illegal sale of controlled dangerous substances, including but not limited to chemicals commonly utilized in the illegal manufacture of methamphetamine.

3. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, and conversations with others who have personal knowledge of the events and circumstances described herein. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

4. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 21 United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii) [Distribution of Methamphetamine] and Title 21 United States Code, Sections 841(a)(1) and 841(b)(1)B)(vi) [Distribution of Fentanyl] will be located in the electronically stored information described in Attachment B and is recorded on the devices described in Attachment A.

### Identification of the Devices to be Examined

5. The property to be searched is a blue Apple iPhone with an unknown International Mobile Equipment Identity (IMEI) and a blue Samsung Android phone with IMEI 351488900197197, hereinafter the "Devices." These Devices are currently located at 4944 S. 83rd E. Avenue, Tulsa, Oklahoma 74145.

6. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### Probable Cause

7. On October 8, 2023, at approximately 9:36 pm, TPD Officer Bailey Lewis was on routine patrol in the area of 1700 East 14th Place in Tulsa, Oklahoma and observed a car with Muskogee Creek Nation tag H6S98. Officer Lewis queried the tag and discovered it expired on July 31, 2023. Officer Lewis initiated a traffic stop on the vehicle and contacted the driver, later identified as Shelly Annette McElroy. The car's front seat passenger was later identified as Gary Don McElroy. Shelly McElroy told Officer Lewis that she did not have a valid driver's license and could

4

not provide valid insurance verification. The driver and front seat passenger handed officers Oklahoma ID cards. TPD Officer Mackey, present at the traffic stop as a backing officer, observed a large box in plain view at Gary McElroy's feet. Officers saw that the large box contained multiple, large, clear plastic baggies containing a white crystalline substance. Officer Mackey stated, "based on his training and experience, the white crystalline substance appeared to be a narcotic."

As officers returned to their patrol car to conduct queries, Shelly McElroy accelerated her car away from the traffic stop at a high rate of speed.

A short pursuit ensued, during which Shelly McElroy committed several traffic violations and eventually collided with an occupied civilian car. The pursuit finally ended in the parking lot of the QuikTrip located at 1509 South Lewis Avenue, Tulsa, Oklahoma. Both Shelly and Gary McElroy were arrested.

After the pursuit and arrests, TPD officers conducted an inventory search of the McElroys' car. During that search, Officer Waggnor recovered a glass pipe in the driver's side door, a broken glass pipe on the driver's side floorboard, and a small baggie containing a white crystalline substance that tested presumptively positive for methamphetamine. At the time of the inventory search, officers noticed the large box that contained large baggies of suspected narcotics, observed during the initial traffic stop, was missing from inside the McElroys' car.

Officer Mackey located the missing box and baggies at 1760 East 14th Place after retracing the route of the car chase. Inside the large box, TPD officers discovered six large baggies. Three of the baggies contained a white crystalline substance, and the

remaining three baggies contained a chalky white substance. TPD Officer Perry conducted field tests on the substances. The chalky white substance tested presumptively positive for fentanyl and the white crystalline substance tested presumptively positive for methamphetamine. The gross weight of the suspected fentanyl was approximately 121.5 grams, and the gross weight of the suspected methamphetamine was approximately 3,030.1 grams.

A blue Apple iPhone with an unknown IMEI and a blue Samsung Android phone with IMEI 351488900197197 were recovered from the McElroys' car. The Devices were turned in at the Tulsa Police Department's property room under property receipt number BW0592.

The McElroys were arrested and booked into custody at David L. Moss Criminal Justice Center. On October 10, 2023, TPD Officer Justin Beal listened to Shelly McElroy's jail calls. Officer Beal advised that during the jail calls, Shelly McElroy advised the person she was speaking to on the phone to remotely wipe the contents of her cellular phone. During that call, Shelly McElroy provided the passcode for her cellular phone.

8. The Devices are currently in storage at 4944 S. 83rd E. Avenue, Tulsa, Oklahoma 74145. In my training and experience, I know that the Devices are stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices were seized by TPD.

6

### Technical Terms

9. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.  *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store

7

their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The

Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include

9

global positioning system ("GPS") technology for determining the location of the device.

f.  *Tablet*: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  *Pager*: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a

10

range of IP addresses. Some computers have static—that is, long-term—
IP addresses, while other computers have dynamic—that is, frequently
changed—IP addresses.

i. *Internet*: The Internet is a global network of computers and other
electronic devices that communicate with each other. Due to the
structure of the Internet, connections between devices on the Internet
often cross state and international borders, even when the devices
communicating with each other are in the same state.

10. Based on my training, experience, and research, I know that the Devices have
capabilities that allow them to serve as a wireless telephone, digital camera, portable
media player, GPS navigation device, and PDA. In my training and experience,
examining data stored on devices of this type can uncover, among other things,
evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

11. Based on my knowledge, training, and experience, I know that electronic
devices can store information for long periods of time. Similarly, things that have
been viewed via the Internet are typically stored for some time period on the device.
This information can sometimes be recovered with forensics tools.

12. I know that cellular telephones are often equipped with digital cameras and
those phones possess the capability to transmit and/or store electronic images. I
know that in many cases, cellular telephones maintain photographs of illegal
activities to include evidence of illegal drug trafficking. These photos are sometimes

11

stored in the subject's cellular phone and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages and emails are often used by two or more persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

13. I know that cellular telephones are used by most individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications including but not limited to "WhatsApp", "Signal", and "Telegram." Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done using Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include drug trafficking.

14. Based on my education, training, and experience, I know that individuals involved in the use, sales, manufacturing, and transportation of illegal narcotics often use cell phones and other electronic devices to further their trade by conducting

12

business on them via text messages and phone calls. I also know from my training, education, and experience that:

    a.  Drug distributors/traffickers commonly maintain books, records, receipts, notes, ledgers, and other documents/papers both electronically and in paper form, which relate to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code and/or identify customers/sources/co-conspirators through monikers/nicknames. Documentation such as this oftentimes results because drug distributors/traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients and must account for these transactions in order to collect outstanding drug debts.

    b.  Drug distributors/traffickers commonly maintain addresses or telephone numbers in notebooks, papers, cellular phones, computers and electronic storage media which reflect names, address, and/or telephone numbers for their associates in the drug distribution/trafficking organization, even if said items may be in code, and such traffickers send and receive items listed in this affidavit by mail and other common carriers.

    c.  Drug users, distributors and traffickers frequently take, or cause to be taken photographs or videotapes of themselves, their associates, their property/assets, and their product, and these individuals usually

13

maintain these photographs or recordings/videos in the residences under their control. These photographs and videos are also often found in the individual's cellular telephone, computers and other electronic storage media.

d. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

e. Text messages and e-mails are often used by two or more persons to communicate information regarding illegal activities between two telephones or between one telephone and a personal computer. This information can include directions for deliveries, stash locations, prices, cell phone contact numbers, and instructions.

f. Cellular telephones often contain stored phone numbers and contact information of individuals that conduct business with other co-conspirators who possess the cellular telephone.

g. When drug users/dealers/traffickers use text messages to discuss topics such as quantities, prices, and the quality of controlled dangerous

14

substances, as well as dates, times and locations for drug transactions,
these communications are often in coded drug talk/jargon and require
review by peace officers experienced in deciphering such
communications.

h. In my experience in searching cellular telephones possessed by known
drug users/distributors/traffickers, photos and/or videos have been
discovered which evidence the use and distribution of controlled
dangerous substances and the proceeds intended for or derived
therefrom. This evidence often depicts pictures/videos of drugs for
showing drug quality, condition, or quantity. Moreover, users will
commonly document episodes of drug use in social settings.
Additionally, drug distributors will take pictures ("trophy" pictures) or
otherwise capture digital recordings for the purpose of memorializing
their credibility/capability as a drug dealer and accomplishments
(acquisition of assets/large amounts of U.S. currency) relating thereto.

i. In all phases of drug distribution, the utilization of cellular telephones is
essential. Drug users/dealers/traffickers use cellular telephones to place
calls, as well as communicate by SMS text messaging. As drug dealing
necessarily entails constant communications with accomplices, co-
conspirators, clients, and sources, these communications virtually
always take place by voice calls and text messaging over cellular
telephones.

j.  Cellular telephones are almost always used by drug distributors to
    communicate. They will communicate by verbal conversations, digital
    text messaging, and/or sending photographs to one another. To avoid
    detection, drug distributors will often speak in coded language or
    through use of vague messages. Sometimes the cellular telephone
    numbers they use are listed in a different individual's name or they will
    frequently change phone numbers. Drug distributors will often "drop"
    or switch cellular phones to avoid detection by law enforcement. This
    will result in the accumulation of several different cellular phones.

15. *Forensic evidence*. As further described in Attachment B, this application seeks
permission to locate not only electronically stored information that might serve as
direct evidence of the crimes described on the warrant, but also forensic evidence
that establishes how the Device was used, the purpose of its use, who used it, and
when. There is probable cause to believe that this forensic electronic evidence might
be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was
    once on the storage medium but has since been deleted or edited, or of a
    deleted portion of a file (such as a paragraph that has been deleted from
    a word processing file).

b.  Forensic evidence on a device can also indicate who has used or
    controlled the device. This "user attribution" evidence is analogous to

16

the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

16. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire

medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

17. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

18. *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Devices. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications.

18

Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

### Conclusion

19. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

20. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

William Mackenzie
Task Force Officer DEA

Subscribed and sworn before me *by phone* on this 13th day of October 2023.

Christine D. Little
United States Magistrate
Northern District of Oklahoma

19

## ATTACHMENT A

### Property to be Searched

The property to be searched is a blue Apple iPhone with an unknown IMEI and a blue Samsung Android phone with IMEI 351488900197197. These Devices are currently located at 4944 S. 83rd E. Avenue, Tulsa, Oklahoma 74145. The Devices are pictured below.



This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

**Particular Things to be Seized**

All records on the Device described in Attachment A that relate to Possession

With Intent to Distribute Methamphetamine in violation of Title 21 United States

Code, Sections 841(a)(1) and 841(b)(1)(A)(viii) [Distribution of Methamphetamine]

and Title 21 United States Code, Sections 841(a)(1) and 841(b)(1)(B)(vi)

[Distribution of Fentanyl], including:

1. Records relating to communication with others as to the criminal offense
   above; including incoming and outgoing voice messages; text messages;
   multimedia messages; applications that serve to allow parties to communicate;
   all call logs; secondary phone number accounts, including those derived from
   Skype, Line 2, Google Voice, and other applications that can assign roaming
   phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense
   above, including voice memos, photographs, videos, and other audio and
   video media, and all ExIF information and metadata attached thereto
   including device information, geotagging information, and information of the
   relevant dates to the media;

3. Records relating to the planning and execution of the criminal offense above,
   including Internet activity, firewall logs, caches, browser history, and cookies,
   "bookmarked" or "favorite" web pages, search terms that the user     entered

into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4. Application data relating to the criminal offense(s) above;

5. Lists of customers and related identifying information;

6. Types, amounts, and prices of drug trafficked as well as dates, places, and amounts of specific transactions;

7. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

8. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

9. All records and information related to the geolocation of the Devices at a specific point in time and travel in furtherance of the criminal offense(s) listed above; and

10. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.